# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

| | | |
|---|---|---|
| Sheila Brenette Travis, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action File No.: |
| | ) | |
| v. | ) | |
| | ) | |
| Equifax Information Services, LLC | ) | **COMPLAINT** |
| and Select Portfolio Servicing, Inc., | ) | **WITH JURY TRIAL DEMAND** |
| | ) | |
| Defendants. | ) | |
| | ) | |

## PRELIMINARY STATEMENT

Under the Fair Credit Reporting Act, 15 U.S. Code § 1681, *et seq.* (the "FCRA"), consumer reporting agencies are charged with two primary duties: the duty to follow reasonable procedures to assure maximum possible accuracy of information when preparing consumer reports; and, the duty to reasonably reinvestigate consumers' disputes of inaccurate information, and then appropriately correct or modify the disputed information. A consumer reporting agency's duty to reasonably reinvestigate consumers' disputes of inaccurate information explicitly includes the duty to notify the furnisher of the disputed information. This is because

1

the furnisher of the disputed information stands in a far better position to make a thorough investigation of the disputed information than the credit reporting agency.

Under FCRA, furnishers of information have two similar primary duties: to report complete and accurate information regarding the consumers about whom the furnishers report; and, upon receiving notice of a consumer's dispute from a consumer reporting agency, to conduct an investigation of the disputed information, and then modify, delete, or permanently block the reporting of that information as appropriate.

Defendants report and maintain information concerning Plaintiff's credit worthiness, credit standing, credit capacity, character, and general reputation.  That information is then made available for use by third parties in credit transactions involving Plaintiff, for employment purposes, the underwriting of insurance for Plaintiff, and even in connection with a determination of Plaintiff's eligibility for a license or other governmental benefit.  Accordingly, and pursuant to various provisions of the FCRA, Plaintiff has a legally protected interest in Defendants fulfilling their respective duties under the FCRA, so that the information reported and maintained by Defendants is done so in a manner which is fair and equitable to

2

Plaintiff, with regards to the confidentiality, accuracy, and relevancy of that information.

This action for damages is based on Defendants' false reporting on Plaintiff's credit file and/or consumer reports, failures to follow reasonable procedures to assure maximum possible accuracy of the information concerning Plaintiff, and failures to conduct reasonable investigations/reinvestigations with respect to disputes of said information.

## <u>PARTIES</u>

1.    Plaintiff, Sheila Brenette Travis, is a natural person who resides in Coweta County, Georgia.

2.    Plaintiff is an individual and is, therefore, a "consumer" as that term is defined by 15 U.S.C. § 1681a(c).

3.    Defendant, Equifax Information Services, LLC (hereinafter "Equifax"), is a limited liability corporation formed under the laws of the State of Georgia. Equifax may be served with process via its registered agent, Lisa Stockard, at 1550 Peachtree Street NE, Suite H46, Atlanta, Georgia 30309-2402.

4.     Equifax regularly assembles and/or evaluates consumer credit information for the purpose of furnishing consumer reports to third parties and uses interstate commerce to prepare and/or furnish the reports. Accordingly, Equifax is a "consumer reporting agency" as that term is defined by 15 U.S.C. § 1681a(f).

5.     Defendant, Select Portfolio Servicing, Inc. (hereinafter "SPS"), is a corporation formed under the laws of the State of Utah and registered to do business in the State of Georgia. SPS may be served with process via its registered agent, Corporation Service Company, at 40 Technology Parkway South, Suite 300, Norcross, Georgia 30092-2924.

6.     SPS regularly and in the ordinary course of business furnishes information to one or more consumer reporting agencies about consumer transactions, such as Plaintiff's transactions at issue in this lawsuit and described herein, and is, therefore, a "furnisher" as that term is used in 15 U.S.C. § 1681s-2.

## JURISDICTION AND VENUE

7.     This Court has federal question jurisdiction over Plaintiff's Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681, *et seq*., claims, pursuant to 15 U.S.C. § 1681p and 28 U.S.C. § 1331.

4

8.     This Court has personal jurisdiction over Defendants, pursuant to O.C.G.A. § 9-10-91(1), because, *inter alia*, Defendants frequently and routinely conduct business in the State of Georgia, including the conduct complained of herein.

9.     Pursuant to 28 U.S.C. § 1391, venue is proper in the Northern District of Georgia because a substantial part of the events or omissions giving rise to the claims occurred in this district. Pursuant to LR 3.1B(3), NDGa, venue is proper in the Atlanta Division because one or more Defendants maintain agents for service of process within the Atlanta Division.

## Factual Allegations Regarding Plaintiff's Mortgage

10.     On or about February 1, 2007, Plaintiff obtained a loan from Encore Credit Corp. (hereinafter "Encore") for the original principal amount of $178,650.00 (the "Mortgage").

11.     The Mortgage is collateralized by residential real property located at 253 Ruth Drive, Newnan, Georgia 30265-1341, as evidenced by the Security Deed recorded at Deed Book 3134, Page 416, in the Superior Court of Coweta County.

12.     On or about April 28, 2011, the Mortgage was transferred from Encore to Ocwen Loan Servicing, LLC (hereinafter "Ocwen"), as evidenced by the

5

Assignment recorded at Deed Book 3675, Page 313, in the Superior Court of Coweta County.

13.    Subsequently, the Mortgage was transferred from Ocwen to Select Portfolio Servicing, Inc. (hereinafter "SPS"), but it appears that no Assignment was filed in the Superior Court of Coweta County.

**Factual Allegations Regarding Plaintiff's Bankruptcy Case**

14.    On December 15, 2012, Plaintiff filed a Chapter 13 Voluntary Bankruptcy Petition in the United States Bankruptcy Court for the Northern District of Georgia, Newnan Division, Case Number 12-13542 (the "Bankruptcy Case").

15.    In Schedule D of her Bankruptcy Petition, Plaintiff listed Ocwen as having a secured claim for the Mortgage in the amount of $163,574.00.

16.    On February 19, 2013, Plaintiff filed her Chapter 13 Plan in accordance with 11 U.S.C. § 1322(b)(5), providing for the cure of any then-deficiency and the direct payment of all future Mortgage payments by Plaintiff to Ocwen.

17.    On May 14, 2013, Plaintiff's Plan was confirmed and became *res judicata* as to Plaintiff and repayment of the Mortgage.

18.   Ocwen was served with a copy of the Confirmation Order on May 16, 2013, by the Bankruptcy Noticing Center.

19.   Subsequently, the Mortgage was assigned from Ocwen to SPS, but no Transfer of Claim was filed with the Bankruptcy Court.

20.   On July 26, 2017, SPS file a Notice of Mortgage Payment Change in Plaintiff's Bankruptcy case.

21.   On November 3, 2017, the Bankruptcy Court issued an Order of Discharge in favor of Plaintiff. The Bankruptcy Court order specifically excluded from discharge, however, any debt provided for under 11 U.S.C. § 1322(b)(5), such as Plaintiff's Mortgage. The applicable language of the Order is set forth below:

**Most debts are discharged**
Most debts are covered by the discharge, but not all.
Generally, a discharge removes the debtors' personal
liability for debts provided for by the chapter 13 plan.

In a case involving community property: Special rules
protect certain community property owned by the debtor's
spouse, even if that spouse did not file a bankruptcy case.

**Some debts are not discharged**
Examples of debts that are not discharged are:

◆ debts provided for under 11 U.S.C. §
   1322(b)(5) and on which the last payment or
   other transfer is due after the date on which
   the final payment under the plan was due;

7

22.   The Mortgage owed to SPS was not discharged and was not subject to discharge under 11 U.S.C. § 1328(a)(1). See, *In re Duke*, 447 B.R. 365 (Bankr. M.D. Ga. 2011).

23.   As recently as July 26, 2017, SPS advised the Bankruptcy Court and Plaintiff that Plaintiff's Mortgage was being serviced by SPS and that Plaintiff's obligation is ongoing.

24.   Accordingly, Plaintiff has continued to make Plaintiff's Mortgage payments to SPS post-discharge.

25.   SPS has continued to service Plaintiff's Mortgage post-discharge.

26.   SPS has continued to accept Plaintiff's Mortgage payments post-discharge.

27.   The balance of the Mortgage is not $0.

**Factual Allegations Regarding Consumer Reports
Containing Incorrect Information**

28.   The term "consumer report" means any written, oral, or other communication of any information by a consumer reporting agency bearing on a consumer's credit worthiness, credit standing, credit capacity, character, general reputation, personal characteristics, or mode of living which is used or expected to

be used or collected in whole or in part for the following: a factor in establishing the consumer's eligibility for credit or insurance to be used primarily for personal, family, or household purposes; employment purposes; a credit transaction involving the consumer on whom the information is to be furnished and involving the extension of credit to; the review or collection of an account of the consumer; the underwriting of insurance involving the consumer; determination of the consumer's eligibility for a license or other benefit granted by a governmental instrumentality required by law to consider an applicant's financial responsibility or status; used by a potential investor or servicer, or current insurer, in connection with a valuation of, or an assessment of the credit or prepayment risks associated with, an existing credit obligation; used by a person who otherwise has a legitimate business need for the information; used in connection with a business transaction that is initiated by the consumer; to review an account to determine whether the consumer continues to meet the terms of the account; and/or used by executive departments and agencies in connection with the issuance of government-sponsored individually-billed travel charge cards. 15 U.S.C. §§1681a(d)(1) and 1681b(a)(3).

9

29.  The terms "consumer report," "credit report," and "consumer credit report" are used synonymously herein.

30.  The reporting of consumer credit information, by credit reporting agencies ("CRAs") and data furnishers, is the foundation of credit risk scoring and impacts the financial lives of consumers in innumerable ways, including the availability and cost of credit, housing opportunities, leasing prospects, insurance availability and cost, utility service, and even employment. Approximately two million consumer reports are issued by credit bureaus each day. See,

Robert B. Avery, Paul S. Calem, and Glenn B. Canner, Federal Reserve Board, Division of Research and Statistics, and Raphael W. Bostic, University of Southern California, *An Overview of Consumer Data and Credit Reporting* (February 2003), p 48-49, available at

*https://www.federalreserve.gov/pubs/bulletin/2003/0203lead.pdf*

(accessed November 16,2017)

31.  In 2012, the Federal Trade Commission conducted a study regarding consumer credit reporting errors and determined that anywhere from 10 to 21 percent of consumers have confirmed errors on their consumer reports. Federal Trade

10

Commission, *Report to Congress Under Section 319 of the Fair and Accurate Credit Transactions Act of 2003* (December 2012), p iv of Executive Summary, available at

 *https://www.ftc.gov/sites/default/files/documents/reports/section-319-fair-and-accurate-credit-transactions-act-2003-fifth-interim-federal-trade-commission/130211factareport.pdf* (accessed November 16,2017).

32.   The FTC study found that not only do these errors adversely affect consumers' credit scores, but the estimated proportion of reports and consumers who experience a positive credit score change resulting from the *correction* of these errors is higher than previous estimates from the credit reporting industry. *Id.*

33.   There is no established rule or threshold for classifying the significance of a credit score change as minor or major, because the impact of a change in score is dependent on the current score. That is, a twenty-five-point change in a credit score that keeps the consumer in a particular credit risk category may not have a large impact on the person's likelihood of receiving credit. However, a one-point change in credit score that moves the consumer from one risk tier to the next may

have a large impact on the consumer's access to credit or the products and rates the consumer is able to secure.  *Id*. at i.

34.    Consistent with FTC study, the Fair Isaac Corporation states that inaccurate or incorrect information on a consumer's credit report can hurt their score. See,      *https://www.myfico.com/credit-education/questions/fix-errors-on-credit-report/* (accessed November 16, 2017).

## Factual Allegations Regarding the Consumer Credit Reporting Industry, Reporting Standards, and Disputed Information

35.    The Consumer Data Industry Association ("CDIA") is an international trade association, representing over 140 members involved in credit reporting, mortgage reporting, check verification, tenant and employment screening, collection services, and fraud verification services, and the CDIA is active in both federal and state legislative affairs, public relations, education, and the promulgation of industry standards.

36.    Because consumer credit reporting information is such sensitive data that has far reaching implications for most, if not all, consumers, the CDIA works together with CRAs to develop, maintain and enhance industry-standard reporting formats and guidelines.

12

37.   In cooperation with Trans Union LLC, Equifax Information Services, LLC, Experian Information Solutions, Inc., and Innovis Data Solutions, Inc., the CDIA publishes the Metro 2 ("Metro 2") reporting standards to assist data furnishers with their compliance requirements under the FCRA. CDIA's reporting products are used in more than nine billion transactions each year.

See, *http://www.cdiaonline.org/about/index.cfm?unItemNumber=515*.

38.   The uniform adoption and implementation of the Metro 2 standards is the primary vehicle by which CRAs and data furnishers ensure that they are in compliance with their duties to ensure that they maintain complete and accurate information under the FCRA.

39.   The Metro 2 standards provide uniformity in the reporting and interpretation of credit data, including credit risk scoring.

40.   Equifax has actual knowledge that entities reviewing consumer reports prepared by Equifax reasonably presume that Equifax has complied with CDIA guidelines and Metro 2 standards in compiling and reporting the data in those consumer reports.

41.   SPS has actual knowledge that entities reviewing consumer reports containing information reported and furnished by SPS reasonably presume that SPS has complied with CDIA guidelines and Metro 2 reporting that data to consumer reporting agencies.

42.   § 1681i(a)(5)(D) of the FCRA requires CRAs to implement an automated reinvestigation system through which furnishers of information to a CRA may report the results of a reinvestigation that finds incomplete or inaccurate information in a consumer's file to other CRAs.

43.   To comply with the automated dispute reinvestigation requirements of the FCRA, the three national CRAs (Trans Union LLC, Equifax Information Services, LLC, Experian Information Solutions, Inc.) along with Innovis Data Solutions, Inc. developed and implemented a browser-based software system that allows the CRAs to electronically notify furnishers easily and quickly of disputed credit reporting information, and for furnishers to easily and quickly respond to such disputes following investigation. The system is commonly referred to as e-OSCAR (Online Solution for Complete and Accurate Reporting) and was designed to be Metro 2 compliant.

See, *http://www.e-oscar.org/*.

44.    The e-OSCAR system primarily supports Automated Credit Dispute Verification ("ACDV") and Automated Universal Dataform ("AUD") processing, as well as other various related data reporting processes.

45.    ACDVs are notifications initiated by a CRA, and transmitted to a furnisher, in response to a consumer dispute, and are the primary method the CRAs use to fulfill their statutory obligation to notify furnishers of disputed information of consumers' disputes.

46.    Equifax has actual knowledge that entities reviewing consumer reports prepared by Equifax reasonably presume that Equifax has complied with its duties under § 1681e in compiling and reporting data with maximum possible accuracy in consumer reports.

47.    Equifax has actual knowledge that entities reviewing consumer reports prepared by Equifax reasonably presume that Equifax has complied with its duties under § 1681i in reinvestigating and correcting disputed information, and thus maintaining the maximum possible accuracy of data reported in consumer reports.

48.    SPS has actual knowledge that entities reviewing consumer reports containing information reported and furnished by SPS reasonably presume that SPS has complied with its duties under § 1681s-2(b) in investigating and correcting disputed information.

## Factual Allegations Regarding Consumer Reports Containing Incorrect Information, and the Impact on Scoring

49.    The Fair Isaac Corporation credit risk scoring system, commonly referred to as FICO, is the leading credit scoring system, and utilizes data reported by credit reporting agencies. See, *https://www.myfico.com/credit-education/credit-scores/* (accessed November 16, 2017).

50.    The Fair Isaac Corporation uses the data in consumer reports to calculate consumers' credit scores (also known as credit risk scores). *Id.*

51.    The term "credit score" is a numerical value or a categorization derived from a statistical tool or modeling system used by a person who makes or arranges a loan to predict the likelihood of certain credit behaviors, including default. Consumer Financial Protection Bureau, *Supervision and Examination Manual, Version 2* (October 2012), p 53, available at

*http://files.consumerfinance.gov/f/201210_cfpb_supervision-and-examination-manual-v2.pdf*, (accessed November 16, 2017).

52. FICO scores are calculated from five main categories of credit data in a consumer's credit report. Those categories, and their weighted values, are as follows: payment history accounts for 35% of a consumer's FICO score; debt/amounts owed accounts for 30% of a consumer's FICO score; age/length of credit history accounts for 15% of a consumer's FICO score; new credit/recent inquiries accounts for 10% of a consumer's FICO score; and, mix of accounts/types of credit accounts for 10% of a consumer's FICO score.

See, *www.myfico.com/credit-education/whats-in-your-credit-score/.*

53. Payment history is the most important aspect of a consumer's credit score, because it shows how the consumer has managed their finances, including any late payments. Credit history is also very important, as it demonstrates how long the consumer has been managing their accounts, when their last payments were made, and any recent charges. See, *https://www.transunion.com/credit-score* (accessed November 16, 2017).

17

54.    The cost of credit (e.g., interest rates, fees, etc.), the availability of credit, ratings for insurance products, and even unsolicited credit offers, such as the opportunity to refinance a mortgage at a lower interest rate, extended financing periods and lower rate auto loans, and even zero-percent financing credit offers for in-store credit lines, are all, by and large, driven by a consumer's credit score.

55.    Inaccurate or incorrect credit reporting very often results in a lower FICO and other credit scoring model scores, and thus higher costs of credit, diminished opportunity, and less purchasing power for consumers.

56.    Incorrectly reporting the tradeline of Plaintiff's Mortgage – that has a balance that Plaintiff is making regular payments on – as closed, with a $0 balance, outdated payment information, and the comment "Bankruptcy completed," adversely affects Plaintiff's FICO score, as it excludes any recent positive payment history associated with the Mortgage, it alters the age/length of credit history, and it alters the mix of accounts/types.

57.    Other entities that regularly review consumer reports, and use the data contained therein, are insurance companies.

18

58.   Insurance companies use a scoring mechanism which is similar to, but distinct from, the "credit score" used by creditors.

59.   Credit-based insurance scores, like credit scores themselves, are numerical summaries of consumers' credit histories; credit-based insurance scores are typically calculated using a multitude of information, including but not limited to the length and age of credit history, and the use of certain types of credit.  Federal Trade Commission, *Credit-Based Insurance Scores: Impacts on Consumers of Automobile Insurance* (July 2007), p 11, available at

*https://www.ftc.gov/sites/default/files/documents/reports/credit-based-insurance-scores-impacts-consumers-automobile-insurance-report-congress-federal-trade/p044804facta_report_credit-based_insurance_scores.pdf*

(accessed November 16, 2017).  As cited in *Ins. Inst. V. Commissioner*, 486 Mich. 370, 785 N.W.2d 67 (2010)

60.   Credit-based insurance scores evolved from traditional credit scores, and all major automobile insurance companies use credit-based insurance scores in some capacity; insurers use these scores to assign consumers to risk pools and to determine the premiums that they pay.  *Id*., at 22.

61.   Homeowner's insurance companies also use credit scores to decide whether to issue policies, and on what terms. A higher credit score is taken to mean that a consumer is less of a risk, which, in turn, means the consumer is more likely to be able to obtain insurance, and pay less for it.

See, *https://www.consumer.ftc.gov/articles/0152-credit-scores.*

62.   The National Association of Insurance Commissioners (NAIC) is the U.S. standard-setting and regulatory support organization created and governed by the chief insurance regulators from the 50 states, the District of Columbia and five U.S. territories.  See, *http://www.naic.org/index_about.htm.*

63.   The NAIC, advises consumers who find errors on their credit reports to contact the credit reporting company to have the errors corrected, as the errors can affect the consumer's credit-based insurance score.   National Association of Insurance Commissioners, *Credit-Based Insurance Scores: How an Insurance Company Can Use Your Credit to Determine Your Premium*, available at http://www.naic.org/documents/consumer_alert_credit_based_insurance_scores.htm

64.    Payment history, credit history length, and credit mix (the types of credit a consumer has, such as credit cards, a mortgage, auto loans, etc.) account for 60% of a consumer's credit-based insurance score.  *Id*.

65.    Incorrectly reporting the tradeline of Plaintiff's Mortgage – that has a balance that Plaintiff is making regular payments on – as closed, with a $0 balance, outdated payment information, and the comment "Bankruptcy completed," adversely affects Plaintiff's credit-based insurance score, as it excludes any recent positive payment history associated with the Mortgage, it alters the age/length of credit history, and it alters the mix of accounts/types.

### Factual Allegations Regarding Reporting to and by Equifax

66.    On or about December 18, 2017, Plaintiff obtained a copy of her consumer report as published by Equifax.

67.    That report contained erroneous information as provided by SPS and as published and reported by Equifax.

68.    Specifically, the report shows the Mortgage as having a $0 balance, a status of "closed," a last payment date of December 2012; the Mortgage tradeline also included verbiage suggesting that the Mortgage was discharged in bankruptcy.

21

69.     The relevant portion of the SPS tradeline appeared in the December 18, 2017, Equifax report as follows:

### 3.2 THE LOAN SERVICING CENTER (CLOSED)

**Summary**

Your debt-to-credit ratio represents the amount of credit you're using and generally makes up a percentage of your credit score. It's calculated by dividing an account's reported balance by its credit limit.

| Account Number | xxxxxxxxx 1541 | Reported Balance | $0 |
|---|---|---|---|
| Account Status | INCLUDED_IN_CHAPTER_13 | Debt-to-Credit Ratio | N/A |
| Available Credit | | | |

| High Credit | | Owner | JOINT_CONTRACTUAL_LIABILITY |
|---|---|---|---|
| Credit Limit | | Account Type | MORTGAGE |
| Terms Frequency | UNKNOWN | Term Duration | 0 |
| Balance | $0 | Date Opened | Feb 01, 2007 |
| Amount Past Due | $0 | Date Reported | Dec 15, 2012 |
| Actual Payment Amount | | Date of Last Payment | Dec 01, 2012 |
| Date of Last Activity | | Scheduled Payment Amount | |
| Months Reviewed | 0 | Delinquency First Reported | Dec 01, 2012 |
| Activity Designator | | Creditor Classification | UNKNOWN |
| Deferred Payment Start Date | | Charge Off Amount | |
| Balloon Payment Date | | Balloon Payment Amount | |
| Loan Type | Conventional Real Estate Mortgage | Date Closed | |
| Date of First Delinquency | Dec 01, 2012 | | |

**Comments**

Bankruptcy chapter 13
Loan modified under a federal government plan
Bankruptcy completed

**Contact**

THE LOAN SERVICING CENTER
Customer Support Unit
PO Box 551170
Jacksonville, FL  32255-1170

(Remaining portion of tradeline omitted.)

70.     Because the Mortgage is not closed, the balance of the Mortgage is not $0, the Mortgage was not discharged in bankruptcy, and because Plaintiff continues to make payments to SPS and has done so on a monthly basis for the last five years, the information described above was both false and misleading.

71.     Further, the specific reporting described above was in derogation of accepted industry standards for reporting the account as set forth by the CDIA and Metro 2 and as adopted by Defendants. See e.g., 2015 CDIA Credit Reporting Resource Guide ("2015 Metro 2").

72.     In a letter dated March 6, 2018, Plaintiff disputed the inaccurate and misleading information directly to Equifax and advised Equifax that the Mortgage was included in her Bankruptcy Case but was not discharged, that the current status being reported was incorrect, the balance information reported was incorrect, the payment history was incorrect, and that the date of last payment was incorrect. The relevant portion of Plaintiff's dispute is reproduced below:

My mortgage was included in my bankruptcy (case number 12-13542, filed December 15, 2012), which was discharged on November 3, 2 017. However, my mortgage was not discharged, as it is a long-term debt that is not subject to discharge. My mortgage account is active and current, and I am continuing to make monthly payments.

I am disputing the following incorrect information that is being reported in the tradeline for my mortgage with Loan Servicing Center:

1. The balance is not $0.
2. The date of last payment is incorrect.
3. The trade line should no longer reference my bankruptcy, since the bankruptcy is closed and the mortgage account was not discharged
4. The amount of the last payment is $700.30.
5. The payment history does not reflect the monthly payments I have been making since December 1, 2012.

I am including copies of documents filed in my bankruptcy from the mortgage company that show that the account is not closed.  Please contact Loan Servicing Center to confirm this information and update this tradeline. Please forward the enclosed documents to assist Loan Servicing Center with its review.

73.     In support of Plaintiff's dispute and to assist Defendants' respective investigations, Plaintiff included with her dispute the following documents: a letter from SPS to the Plaintiff dated June 16, 2017 advising of changes in her monthly mortgage obligations, a copy of a recent Notice of Payment Change filed by SPS in her Bankruptcy Case; and, a copy of the discharge order exempting debts such as that held by SPS from discharge.

24

74.     Pursuant to 15 U.S.C. § 1681i, Equifax had a duty to notify SPS of Plaintiff's dispute within five business days of receiving the dispute, to forward the attached documents for SPS's review, to conduct a reasonable reinvestigation of the disputed information, and to correct the tradeline or delete it from Plaintiff's consumer file.

75.     Upon information and belief, Equifax timely notified SPS of Plaintiff's dispute, via e-OSCAR or otherwise, and provided the supporting documents.

76.     Alternatively, Equifax failed to notify SPS and to provide the supporting documents.

77.     Pursuant to 15 U.S.C. § 1681s-2, SPS had a duty to conduct an investigation with respect to the disputed information and to modify or delete that information appropriately.

78.     Upon information and belief, SPS received notice from Equifax of Plaintiff's dispute, via e-OSCAR or otherwise, and also received the supporting documents.

79.     In a document dated April 6, 2018, Equifax advised Plaintiff that it had researched the dispute, and provided a "revised report" that reflected its findings.

25

Equifax provided a copy of the tradeline as reported "post-investigation", which reproduced the errors identified by Plaintiff in her original dispute letter.

80.     Specifically, the SPS tradeline appeared in the revised April 6, 2018, Equifax report as follows:

>>> **We have researched the credit account. Account # - 2770016481541 The results are:** This account has been updated to show included in bankruptcy/included in bankruptcy of another person. THE FOLLOWING FIELDS HAVE BEEN MODIFIED: *STATUS *TYPE OF ACCOUNT *BALANCE *PAST DUE *HIGH CREDIT *SCHEDULED PAYMENT *DATE OF LAST PAYMENT *DATE OF 1ST DELINQUENCY *WHOSE ACCOUNT *MONTHS REVIEWED *TERMS DURATION *TERMS FREQUENCY *TYPE OF LOAN *BALLOON PAY AMOUNT. If you have additional questions about this item please contact: **The Loan Servicing Center, Customer Support Unit, PO Box 551170, Jacksonville FL 32255-1170**

| Select Portfolio Servicing,inc | | 3815 S West Temple  Salt Lake City UT 84115-4412 : (800) 258-8602 | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Account Number | | Date Opened | High Credit | Credit Limit | Terms Duration | Terms Frequency | | Months Revd | Activity Designator | | Creditor Classification | |
| 277001648* | | 02/01/2007 | $0 | $0 | | | | | | | | |
| Items As of Date Reported | Balance Amount | Amount Past Due | Date of Last Payment | Actual Payment Amount | Scheduled Payment Amount | Date of 1st Delinquency | Date of Last Activity | Date Maj. Del. 1st Rptd | Charge Off Amount | Deferred Pay Start Date | Balloon Pay Amount | Balloon Pay Date | Date Closed |
| 04/06/2018 | $0 | $0 | | $0 | $0 | | | | $0 | | $0 | |
| Status | Type of Account | | Type of Loan | | | Whose Account | | Portfolio Indicator | | Portfolio Status | |
| **Included In Wage Earner Plan** | | | | | | | | | | | |

81.     Defendants' post-investigation reporting is, independently and jointly, false and misleading.

82.     Defendants' post-investigation reporting is, independently and jointly, in derogation of the Metro 2 reporting standards, and that departure and failure to adhere to the adopted guidelines renders the reporting both false and materially misleading, as users of consumer reports assume Defendants' compliance with Metro 2 standards in reporting consumer information.

83.     There is no indication in the tradeline of the "verified" report that Plaintiff has disputed the information reported and published by Equifax and SPS.

The failure to note the legitimate dispute by Plaintiff of the relevant tradeline renders the reporting materially misleading.

## Injuries-in-Fact

84.    Defendants' actions and omissions have resulted in the illegitimate suppression of Plaintiff's FICO credit score and other credit rating model scores.

85.    The adverse effect on Plaintiff's credit score places Plaintiff at the material risk of being denied credit or receiving less favorable credit terms than Plaintiff otherwise would.

86.    Further, the Courts have regularly held that allegations of lower credit scores, taken as true, are sufficient to allege a concrete injury-in-fact for the purposes of standing under Article III. *Pedro v. Equifax, Inc*., 868 F.3d 1275 (11th Cir. 2017) ("[H]er credit score dropped 100 points as a result of the challenged conduct. Because Pedro alleged that she suffered an injury in fact, she has standing to pursue her complaint."); *Diedrich v. Ocwen Loan Servicing, LLC*, 839 F.3d 583 (7th Cir. 2016) (standing where Plaintiffs alleged that they "have suffered damage to their credit and been forced to pay Ocwen greater payments and a higher interest rate"); *Santangelo v. Comcast Corp*., 162 F. Supp. 3d 691 (N.D. Ill. 2016) ("a depleted

27

credit score is sufficient to constitute an injury-in-fact for the purposes of establishing Article III standing"); *Binns v. Ocwen Loan Servicing, LLC*, No. 14-01764, 2015 U.S. Dist. LEXIS 132743, 2015 WL 5785693, at *9 (S.D. Ind. Sept. 30, 2015) ("injuries to plaintiffs' credit scores and reputations were considered intangible harms"); *Rothman v. U.S. Bank Nat'l Ass'n,* No. 13-03381, 2014 U.S. Dist. LEXIS 141100, 2014 WL 4966907, at *5 (N.D. Cal. Oct. 3, 2014) ("Injury to a credit score is sufficient to constitute 'actual damages'"); *Green v. RentGrow, Inc.*, No. 2:16cv421, 2016 U.S. Dist. LEXIS 166229 ("A decrease in credit score may still establish an injury in fact sufficient to confer standing"); *Adams v. Fifth Third Bank*, No. 3:16-CV-00218-TBR, 2017 U.S. Dist. LEXIS 18932 (W.D. Ky. Feb. 9, 2017) ("Plaintiffs' allegations of lower credit scores … are sufficient to allege a concrete injury-in-fact for the purposes of standing under Article III."); and, *Coulbertson v. Experian Info. Sols., Inc.*, No. 16-cv-05672-RS, 2017 U.S. Dist. LEXIS 69484 (N.D. Cal. Mar. 24, 2017) ("At a minimum, Coulbertson has alleged a sufficient injury-in-fact through her claim that her credit score suffered as a result of the credit report she disputes").

87.   Defendants' actions and omissions have resulted in the illegitimate suppression of Plaintiff's credit-based insurance scores.

88.   The adverse effect on Plaintiff's credit-based insurance scores places Plaintiff at the material risk of being denied insurance or receiving less favorable insurance rates and terms than Plaintiff otherwise would.

89.   Defendants' actions and omissions have also caused Plaintiff's Equifax credit reports to falsely indicate to any viewer of those reports that Plaintiff does not have a mortgage, and that the Mortgage was discharged in bankruptcy.

90.   This false impression creates a material risk that Plaintiff would be denied credit, receive less favorable credit treatment than she otherwise would, or receive other unfavorable treatment than she otherwise would, from any viewer of Plaintiff's credit report engaged in judgment-based lending.

## Damages

91.   Defendants, independently and jointly, breached their respective duties as described herein.

92.   Defendants had actual notice that the information they were reporting regarding Plaintiff and the Mortgage was false, deceptive, and misleading.

29

93.    Plaintiff provided all of the information necessary for Defendants to correct their false, deceptive reporting.

94.    Defendants had the ability to easily correct their false, deceptive reporting.

95.    Despite the foregoing, Defendants failed to correct their false, deceptive, and misleading reporting as described herein.

96.    Instead, Defendants continued to report the false, deceptive, and misleading information regarding Plaintiff and the Mortgage.

97.    Accordingly, Defendants' conduct was willful.

98.    Upon information and belief, Defendants have published the false and misleading information regarding Plaintiff to third parties.

99.    As a result of Defendants' willful actions and omissions, Plaintiff is eligible for statutory damages.

100.    Additionally, as a result of Defendants' actions and omissions, Plaintiff has suffered actual damages, including out-of-pocket expenses in challenging Defendants' wrongful representations regarding the Mortgage.

101.   Realizing that Defendants have, in effect, deprived Plaintiff of an extended period of positive credit reporting on the most important account Plaintiff has, and that Defendants continue to do so as a result of their respective failures to comply with the statutory requirements of 15 U.S.C. § 1681 et seq., Plaintiff has experienced worry, frustration and stress.

102.   As a result of the actions and omissions of Defendants, Plaintiff's actual damages include the illegitimate suppression of her FICO credit score and other credit rating modeling scores.

103.   As a result of the actions and omissions of Defendants, Plaintiff's actual damages also include the illegitimate suppression of her credit-based insurance score.

104.   Defendants' failures to correct and clear the inaccuracies in Plaintiff's Equifax report creates a material risk of financial harm to Plaintiff stemming from the decreased perception of Plaintiff's creditworthiness.

## CAUSES OF ACTION

### COUNT I

**VIOLATIONS OF THE FAIR CREDIT REPORTING ACT**
**15 U.S.C. §§ 1681e(b) and 1681i – Equifax Information Services, LLC**

105.   Plaintiff incorporates by reference all preceding paragraphs as though fully stated herein.

106.   Pursuant to 15 U.S.C. § 1681e(b), Equifax is responsible for following reasonable procedures to assure maximum possible accuracy of information whenever it prepares consumer reports.

107.   Pursuant to 15 U.S.C. § 1681i(a)(1)(A), Equifax had an affirmative duty to independently investigate the dispute submitted by Plaintiff.

108.   Pursuant to 15 U.S.C. § 1681i(a)(2), Equifax was required to communicate the specifics of Plaintiff's dispute to SPS, including the forwarding of any documents provided by Plaintiff in support of that dispute.

109.   A consumer reporting agency's reasonable reinvestigation must be a good faith effort to ascertain the truth; a reasonable reinvestigation must answer the substance of the consumer's dispute, and may not merely be a *pro forma* record review that simply begs the question.

32

110.   In order to conduct a reasonable reinvestigation, and pursuant to 15 U.S.C. § 1681i(a)(4), Equifax was required to review and consider all relevant information submitted by Plaintiff.

111.   Plaintiff's dispute was clear and unambiguous as to the inaccuracies of Equifax's reporting.

112.   Plaintiff provided all the relevant information necessary for Equifax to reinvestigate and correct the inaccuracies in its reporting.

113.   Equifax breached its duties as described herein.

114.   If Equifax had conducted a reasonable reinvestigation of Plaintiff's dispute, Equifax would have reviewed and considered all of the information Plaintiff submitted in her dispute letter and would have easily detected that what was being reported was factually incorrect, inaccurate, and misleading.

115.   If Equifax had conducted a reasonable reinvestigation of Plaintiff's dispute, the tradeline on Plaintiff's Equifax consumer report would have been appropriately corrected.

116.   Due to Equifax's failures to follow reasonable procedures to assure maximum possible accuracy of information and failures to conduct a reasonable

reinvestigation of Plaintiff's dispute, the false and misleading information in Plaintiff's credit file and on Plaintiff's Equifax report was not appropriately modified.

117.   Equifax had all the information necessary to correct its reporting. Yet, Equifax failed to correct the information in the face of clear evidence that its reporting was false and misleading. The failure indicates that Equifax's review procedures were not reasonable.

118.   The fact that Equifax had all the information necessary to correct its reporting, yet failed to do so in an appropriate manner, further indicates that Equifax recklessly disregarded Plaintiff's dispute and the requirements of the FCRA, amounting to a willful violation of the statute.

119.   Equifax willfully, or in the alternative negligently, violated 15 U.S.C. § 1681e(b) by failing to follow reasonable procedures to assure the maximum possible accuracy of information concerning Plaintiff in her consumer reports, in reckless disregard of the statutory requirements, Plaintiff's dispute, and the publicly recorded Bankruptcy Case filings.

120.    Equifax willfully, or in the alternative negligently, violated 15 U.S.C. § 1681i in multiple ways, including without limitation, by failing to conduct a reasonable reinvestigation of Plaintiff's dispute, and by failing thereafter to appropriately modify information in her file and on her consumer report in reckless disregard of the statutory requirements, Plaintiff's dispute, and the publicly recorded Bankruptcy Case filings.

121.    As a result of Equifax's violations of 15 U.S.C. §§ 1681e(b) and 1681i, Plaintiff has suffered actual damages as described herein. Plaintiff is, therefore, entitled to recover actual damages from Equifax pursuant to 15 U.S.C. §§ 1681n and 1681o.

122.    Equifax's actions and omissions were willful, rendering Equifax liable to Plaintiff for punitive damages and/or statutory damages pursuant to 15 U.S.C. § 1681n.

123.    Plaintiff is entitled to recover costs and attorneys' fees from Equifax pursuant to 15 U.S.C. §§ 1681n and 1681o.

## COUNT II

## VIOLATIONS OF THE FAIR CREDIT REPORTING ACT
## 15 U.S.C. § 1681s-2(b) – Select Portfolio Servicing, Inc.

124.   Plaintiff incorporates by reference paragraphs 1 through 104 as though fully stated herein.

125.   Pursuant to 15 U.S.C. § 1681s-2(a), SPS is responsible for providing accurate information whenever it furnishes information to any consumer reporting agencies.

126.   Upon information and belief, Equifax timely notified SPS of Plaintiff's dispute and provided SPS with all the relevant information that Plaintiff had submitted.

127.   Pursuant to 15 U.S.C. § 1681s-2(b), SPS had a duty to investigate Plaintiff's dispute and accurately report its findings to Equifax.

128.   A furnisher's investigation must be a good faith effort to ascertain the truth; a reasonable investigation must answer the substance of the consumer's dispute, and may not merely be a *pro forma* record review that simply begs the question.

129.   In order to conduct a reasonable investigation, and pursuant to 15 U.S.C. § 1681s-2(b), SPS was required to review and consider all relevant information submitted by Plaintiff to Equifax.

36

130.   Plaintiff's dispute was clear and unambiguous as to the inaccuracies of reporting the Mortgage as closed, with outdated payment information, and a $0 balance.

131.   SPS breached its duties as described herein.

132.   If SPS had conducted a reasonable investigation of Plaintiff's dispute, SPS would have reviewed and considered all of the information Plaintiff submitted to Equifax in her dispute and would have easily detected that what was being reported was factually incorrect, inaccurate, and misleading.

133.   If SPS had conducted a reasonable investigation of Plaintiff's dispute, the tradeline on Plaintiff's consumer reports would have been corrected accordingly.

134.   Due to SPS's failures to provide accurate information, and failures to conduct reasonable investigations of Plaintiff's dispute, the false and misleading information in Plaintiff's credit file and on Plaintiff's reports as described herein was not appropriately modified.

135.   SPS had all the information necessary to correct its reporting. Yet, SPS failed to suitably correct its reporting in the face of clear evidence that it was false and misleading. The failure indicates that SPS's review procedures were not reasonable.

37

136.   The fact that SPS had all the information necessary to correct its reporting, yet failed to appropriately do so, further indicates that SPS recklessly disregarded Plaintiff's dispute and the requirements of the FCRA, amounting to a willful violation of the statute.

137.   SPS willfully, or in the alternative negligently, violated 15 U.S.C. § 1681s-2(b) by failing to conduct a reasonable investigation upon receiving notice of Plaintiff's dispute from Equifax; by failing to appropriately report the results of its investigation; and by failing to appropriately modify the disputed information, in reckless disregard of the statutory requirements; Plaintiff's dispute, and the publicly recorded Bankruptcy Case filings.

138.   As a result of SPS's violations of 15 U.S.C. § 1681s-2(b), Plaintiff has suffered actual damages as stated herein. Plaintiff is, therefore, entitled to recover actual damages from SPS under 15 U.S.C. §§ 1681n and 1681o.

139.   SPS's actions and omissions were willful, rendering SPS liable to Plaintiff for punitive damages and/or statutory damages, pursuant to 15 U.S.C. § 1681n.

140.   Plaintiff is entitled to recover costs and attorneys' fees from SPS, pursuant to 15 U.S.C. §§ 1681n and 1681o.

## **TRIAL BY JURY**

141.   Plaintiff is entitled to and hereby requests a trial by jury.

**WHEREFORE**, Plaintiff prays that judgment be entered in her favor and against Defendants, jointly and severally, for:

a.)  Plaintiff's actual damages;

b.)  Punitive and/or statutory damages, pursuant to 15 U.S.C. § 1681n;

c.)  Reasonable attorney's fees and costs, pursuant to 15 U.S.C. §§ 1681n and/or 1681o; and

d.)  Such other and further relief as may be just and proper.

[Signature on following page.]

39

Respectfully submitted this 14th day of May, 2018.

**BERRY & ASSOCIATES**

*/s/ Matthew T. Berry*
Matthew T. Berry
Georgia Bar No.: 055663
*matt@mattberry.com*
Paul J. Sieg
Georgia Bar No.: 334182
*psieg@mattberry.com*
2751 Buford Highway, Suite 600
Atlanta, GA 30324
Ph. (404) 235-3334
Fax (404) 235-3333

*Plaintiff's Attorneys*